TRANSCRIBED FROM DIGITAL RECORDING

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | | |
|---|---|---|
| JOSE VILLANUEVA, Plaintiff, vs. LAS VEGAS METROPOLITAN POLICE DEPARTMENT, et. al, Defendants. | § | Case No.: 2:24-cv-00125-ART-DJA |

TRANSCRIPT OF MOTIONS PROCEEDINGS
BEFORE THE HONORABLE DANIEL J. ALBREGTS
UNITED STATES MAGISTRATE JUDGE

Tuesday, December 23, 2025; 1:29 p.m.
Las Vegas, Nevada

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:

Adam J. Breeden
BREEDEN & ASSOCIATES, PLLC
7432 W. Sahara Avenue, Suite 101
Las Vegas, Nevada 89117

(Appearances continued on page 2.)

DIGITALLY RECORDED: Liberty Court Recorder (LCR)
1:29 p.m. - 2:42 p.m.

RECORDED BY: Angela Reyes

TRANSCRIBED BY: Gayle Wear, RPR, CRR
Gayle_wear@nvd.uscourts.gov

Proceedings recorded by electronic sound recording; transcript produced by machine shorthand and computer-aided transcription.

APPEARANCES OF COUNSEL:
(Continued from page 1.)

FOR THE DEFENDANTS:

Kristopher John Kalkowski
KAEMPFER CROWELL
1980 Festival Plaza Drive
Suite 650
Las Vegas, Nevada 89135

* * *

LAS VEGAS, NEVADA; TUESDAY, DECEMBER 23, 2025; 1:29 P.M.

---o0o---

R E C O R D E D P R O C E E D I N G S

---o0o---

THE COURTROOM DEPUTY: This is the time set for the motion hearing in case number 2:24-cv-125-ART-DJA, Jose Villaneuva versus Las Vegas Metropolitan Police Department.

Counsel, please enter your appearances for the record.

MR. BREEDEN: Good afternoon, Your Honor. Attorney Adam Breeden on behalf of the plaintiff, Jose Villaneuva.

THE COURT: Good afternoon, Mr. Breeden.

MR. KALKOWSKI: Good afternoon, Your Honor. Kris Kalkowski for the defendants.

THE COURT: All right. Good afternoon, Mr. Kalkowski.

This is what the Court wants to be doing less than 24 hours before Christmas -- it's acting like a discovery commissioner, but that's what we're going to do today. We have six matters, two of them are related, on the calendar today. We will go in order of the date in which they were filed.

So first will be number 32, plaintiff's motion for a protective order as it relates to requests for admissions; and number 43 and the related counter-motion, number 49 --

that is 43, the plaintiff's motion to compel, and number 49, the defendant's counter-motion for a protective order -- as it relates to defendant Soriano's financial records. Number 44 is defendants' motion to compel, and that relates to the expert's ChatGPT use and information related to that. And then, finally, two related motions, number 46, plaintiff's motion to reopen discovery, and number 55, defendants' counter-motion to strike. And so I will take them in that order.

I will be providing background and context, and then a brief, and in some instances not so brief, outline of the parties' respective positions for each motion. And then I will outline the legal standard and make a record as to each motion; or in some instances, I will hear arguments, and others, I don't need arguments.

The transcript today will be the order disposing of all of these motions, along with the minute order. So to the extent anyone who disagrees with my rulings today wishes to appeal that to Judge Traum, you will need to get a copy of this transcript in order to do so.

So with that, let's start with plaintiff's motion for a protective order which is the first motion.

Before I do that, as context for all of these motions, this is a civil rights action arising out of plaintiff's, Jose Villaneuva's, allegations that Las Vegas

Metropolitan Police Department Corrections Officer Francis Soriano used excessive force against Mr. Villaneuva while he was detained at the Clark County Detention Center. Mr. Villaneuva alleges that Soriano assaulted him, fracturing his nose and his orbital bone. He sues the Las Vegas Metropolitan Police Department and Soriano for compensatory and punitive damages, alleging claims for violation of plaintiff's Fourth and Eighth Amendment rights; violation of plaintiff's Nevada constitutional rights; Las Vegas Metropolitan Police Department liability under *Monell*; battery under Nevada law; and, finally, negligence and breach of Nevada statutory law.

In the motion docket number 32, the plaintiff moves for a protective order preventing him from having to respond to the Las Vegas Metropolitan Police Department's 49 and Soriano's 82 requests for admissions, which I will refer to as RFAs.

He argues that the volume of the RFAs is abusive and that the RFAs improperly seek admissions of contested facts or legal issues such that they are really disguised as interrogatories, and that the RFAs are improperly compound. Plaintiff relies in part on Nevada law to argue that RFAs may not be directed to contested facts or legal issues.

In response, defendants argue that the number of RFAs is appropriate here where plaintiff has made extensive

allegations. They add that under federal law, RFAs may properly be directed to contested facts and legal issues, and so their RFAs are proper.

Defendants add that plaintiff cannot dictate whether the defendants use RFAs or interrogatories, or any other discovery tools, in defending their case. They also assert that plaintiff fails to point out which objection he raises to which RFA.

I would note that both sides accuse each other of attacking the other in their briefs. I'm not going to get into that, and the Court doesn't find that sort of argument to be very persuasive; and, in fact, it's very unbecoming.

In reply, plaintiff replies that defendants mischaracterized the scope and purpose of Federal Rule of Civil Procedure 36, and reiterate that RFAs are not proper tools to determine contested facts or legal issues. Plaintiff reiterates its arguments that the RFAs are improper and argues that its motion does not need to precisely show which objections go to which RFAs when he can summarize his arguments.

Now, the legal standard as it relates to motions for protective order, the Court under Federal Rule of Civil Procedure 26(c) may grant a protective order for good cause to protect a party or person from annoyance, embarrassment, oppression, undue burden, or expense. The burden is on the

party seeking the protective order to show good cause pursuant to the *Wells Fargo Bank NA v. Iny*, a 2014 Westlaw case with the District of Nevada, May 6, 2014; that's a Westlaw case at 1796216.

Now, whether the Nevada law or federal law applies, the law or the legal standard is as follows: Because the case is in federal court due to federal question jurisdiction, under Federal civil -- Rule of Civil Procedure 1, the Federal Rules of Civil Procedure and federal cases interpreting those rules govern here, and not Nevada rules or Nevada cases interpreting those rules.

As it relates to requests for admissions, the central purpose of a request for admission is to, first, facilitate proof with respect to issues that cannot be eliminated from the case; and, second, to narrow the issues by eliminating those that can be. That's *Conlon v. United States*, 474 F.3d 616 at 622; that's a Ninth Circuit case from 2007.

Regarding the number of RFAs, plaintiff argues that the sheer amount of them is abusive, but Federal Rule of Civil Procedure does not place a limit on RFAs, and plaintiff's argument is not persuasive.

As it relates to the interrogatories disguised as RFAs, plaintiff argues that defendant's RFAs are really interrogatories in disguise because they seek admission of

contested facts or legal issues. Plaintiff relies on Nevada case law for this contention, but as I've already discussed, federal law governs that issue.

As I look at this, I think, at least as I preliminarily look at this, that defendants had the better argument that plaintiff cannot dictate how they conduct discovery, and that RFAs may go to the ultimate factual and legal issues.

Under Federal Rule of Civil Procedure 36(a)(1)(A), an RFA may relate to, quote, "facts, the application of law to fact, or opinions about either," end quote. And a request for admission is not improper merely because it relates to an ultimate fact or could prove dispositive of the entire case. And for that proposition, I would cite to *Wells v. Global Tech Industries, Inc.*, a Nevada case from September 30th, 2022, found at Westlaw 4626014.

Now, I would -- with that, Mr. Breeden, have you had courts just accept the idea that we're not going to answer any of these because they're too burdensome without specifically outlining what the objection is, or at least trying to answer the ones that you think you can answer?

MR. BREEDEN: You know, Your Honor, a little bit of background is, on my way of handling these requests for admissions changed significantly maybe six or nine months ago when I had a case where a request for admissions that I

TRANSCRIBED FROM DIGITAL RECORDING

thought were abusive and improper were served. I did go through them and try to admit or deny, even though I thought they were abusive. And as it turned out, some of them that I admitted we later discussed with the client and they said those should have been denied.

And there were proceedings about whether or not I could withdraw those. And I said, you know what, these are abusive anyway. You shouldn't be allowed to depose a party by requests for admission, there are other means for discovery for accomplishing that; and, therefore, I'm going to begin objecting. In two of these, the other attorneys have not pushed back, they have not even filed to compel responses.

So this is the one that has seen a motion filed over it. And I just think these are improper. These are clearly not relating to facts that are not genuinely in dispute and easily disposed of. You know, if I were forced to admit some of these, it essentially allows my client's adversary to frame the wording of the entire case, and then they can stand up in front of a jury and say, "well, look at this, they admitted to this," and it may not be the form or phrasing, or words, or tone that my client would agree with.

So that's the history of this. No, I have not taken this -- this would be the first hearing that I've taken this issue on, but I do believe strongly on it.

THE COURT: Well, you know, I looked at some of them and I didn't find that as a whole they were all improper, and I don't find, just based on -- I mean, look, do I think that I could maybe do, you know, 20 or 25 RFAs instead of 80? Probably. Do they probably need 80? Probably not. But those aren't the standards that the Court employs. And I try to give parties -- and I don't know if you all have been in front of me before, but I try to give parties some leeway in conducting their discovery, and I also don't want to impose on parties one way to do discovery or the other.

I often hear counsel in cases say opposing counsel wants to do it this way and they should do it that way. And there are times I agree, but it's not my choice. It's up to the lawyers to decide. If they're making a choice that I think is wrong or different, or I would do it differently, that's not the standard.

I don't find as a whole that they're improper just due to the number. And I really can't determine whether they're interrogatories in disguise because I think you have to look at each individual RFA and object. I can't make a determination on an RFA-by-RFA basis because there's no response or objection to any of them, just a blanket response. And our local Rule 26-6 B requires that the motion set forth, quote, "the text of the discovery originally

sought and any response to it," end quote.

And so I cannot and will not, at least in this case or in this situation, grant the blanket protective order. And I'm going to order that the plaintiff attempt to respond to the RFAs and to object where appropriate.

The -- you know, I encourage the parties -- and I'm not optimistic that this will happen, but I encourage the parties to perhaps work together on some of the ones that there are issues or objections or things. And once you've gone through it -- and it may be painstaking and time consuming, but once you've gone through and outline what objections you have specifically to each one, then the Court will be in a better position, or at least in a position, to determine whether or not a protective order asked if certain of the RFAs should be granted.

MR. BREEDEN: Your Honor, may I address an issue?

THE COURT: Yes.

MR. BREEDEN: Your Honor, if I'm going to be compelled to answer these, I don't want to do something that the Court views in bad faith, but my understanding of the rule is I do not have to admit to anything. I can simply deny everything and say we would like these issues to be submitted at trial; we're not going to admit to anything in requests for admission. That's what I would be inclined to do in response to these, is simply deny them all, but I don't

want that to be seen as a bad faith attempt to --

THE COURT: We'll be back here in three months with a motion to compel, and I'll make a determination at that time whether I grant it or deny it, and I'll make the determination whether sanctions are appropriate based upon what the facts are before the Court.

I'm not going to tell you how to respond to them. I'm simply denying the motion to compel -- or, I'm sorry, the motion for a protective order, so. All right. That resolves number 32.

43 is plaintiff's motion to compel, and 49 is defendants' counter-motion for a protective order. In their motion, plaintiff moves the Court to compel Soriano to respond to eleven interrogatories and three requests for production directed at discovering his finances. Plaintiff argues that the requests are relevant to his request for punitive damages, and proportional because they only seek three years of data.

Although Soriano objected due to qualified immunity, plaintiff argues that the doctrine protects officials from litigation, but does not prohibit discovery. Plaintiff also argues that because qualified immunity only applies to federal claims and not plaintiff's state claims, it should not bar discovery entirely.

Soriano also raised Nevada Revised Statute 41.0349,

but that statute only requires Las Vegas Metropolitan Police Department to indemnify employees and but excludes malicious acts. Soriano also invoked NRS Chapter 289, but that chapter protects personal records of peace officers and does not shield officers from discovery. Plaintiff seeks sanctions for Soriano's refusal to respond to the request.

In their response and counter-motion for a protective order, the defendants argue that the parties originally agreed to defer Soriano's responses until after dispositive motions, but that plaintiff's counsel made that agreement contingent on Soriano waiving all objections in exchange.

Defendants argue that deferring Soriano's responses until after the dispositive motions, when the issues of punitive damages and qualified immunity will be decided or narrowed, and then meeting and conferring regarding that discovery, is more prudent. As a practical matter, they claim that doing so means that plaintiff will get Soriano's financial information as it stands at the time of trial rather than months earlier, and that the parties will have time to meet and confer because months typically pass between dispositive motions and the trial.

Defendant also argues that the benefits of qualified immunity, which is a defense against that the suit entirely matches liability, would be lost if he is forced to

disclose his sensitive information before the Court even decides whether the punitive damages are available. Defendant adds that plaintiff's requests are too broad because only Soriano's current, not his past, financial status is relevant.

And in reply, in response to the counter-motion for a protective order, plaintiff argues that an agreement the parties never met is not a reason for the Court to deny a motion to compel. Plaintiff asserts that defendants essentially seek or ask to stay discovery, but don't show good cause to do so. Plaintiff reiterates its arguments that Soriano's objections are improper.

In reply, the defendants reply briefly -- or, I'm sorry, the reply brief largely mirrors the arguments that they had already made.

Once again, as it relates to motions to compel generally, if the party resists discovery, Rule 37(a) authorizes the requesting party to file a motion to compel. The motion must include a threshold showing that the requested information is relevant and proportional. That's at *Tsatas v. Airborne Wireless Network, Inc.*, a 2022 Westlaw case from the District of Nevada, under Westlaw 74003. And also, I would refer the parties to the Federal Rule of Civil Procedure 26(b)(1).

Now, as it relates to motions for protective order,

under Federal Rule of Civil Procedure 26(c), the Court may grant a protective order for good cause to protect a party or person from annoyance, embarrassment, oppression, undue burden, or expense.

As I said earlier, the burden is on the party seeking the protective order to show good cause. In analyzing motions to stay discovery, under Federal Rule of Civil Procedure 26(c), pending dispositive motions, this Court considers whether the dispositive motion can be decided without further discovery and whether good cause exists to stay discovery. *Matt Schrader v. Wynn*, a 2021 Westlaw case from the District of Nevada found at Westlaw 4810324.

Ultimately, the Court's guided by Rule 1, and is trying to determine whether it is more just to move the parties along in discovery and other proceedings while a dispositive motion is pending, or whether it is more just to delay or limit discovery and other proceedings to accomplish the inexpensive determination of the case, and that's the same *Schrader* case.

Now, as it relates to discovery into finances relative to punitive damages, courts in the Ninth Circuit have repeatedly found that a defendant's financial condition is relevant to the pursuit of punitive damages, and that's *EEOC v. California Psychiatric Transitions*, 258 F.3d 391, at 394, and that's an Eastern District of California case from

2009.

On the other hand, the Supreme Court has noted that, quote, "until the threshold qualified immunity question is resolved, discovery should not be allowed," and that's *Harlow v. Fitzgerald*, 457 U.S. 800, at 18; that's a 1982 case.

In balancing the relevance of financial information appeared that damages for qualified immunity, some courts have delayed discovery into a defendant's financial condition in Title 42, United States Code, Section 1983 actions pending resolution of a qualified immunity claim. Again, that's *Klein v. City of Beverly Hills*, a 2015 case from the Central District of California -- it compiles cases that stand for that proposition -- and it's found at Westlaw 13906841.

So let me, Mr. Breeden, turn to you again in this one. What is the harm if we wait until after the dispositive motions to get into the finances of Mr. Soriano? You've already requested it. If I were to grant the motion for a protective order and deny the motion to compel at this stage, those requests are there. If your punitive damage claims and the qualified immunity goes in your favor at the dispositive motions, then you'd be entitled to it. What is wrong with you getting it then, when usually trials are going to be a few months out after the dispositive motions? I mean, you have a few months to look into it and get that information.

MR. BREEDEN: Well, so this is what the issue is. If they would agree, "yes, we will answer them, we're not just going to file a protective order at that time, and we're not going to have a bunch of discovery conferences at that time, we will file genuine good faith answers," then I would agree to that. But what my -- what I have seen in the past is that you do something like that and then you really don't get responses, you just get objections. There are a bunch of discovery issues then to present to the Court back and forth a month or two before trial, and the Court can't adjudicate it in time for us to get the needed information.

THE COURT: Well, I certainly could understand that being one path that the case goes down. But what I'm hearing from counsel is that they're saying they would meet and confer with you and provide that information, you know -- I mean, I don't want to assume that it's going to erupt. Although, if I were to assume if a case would, it might be this one, that it's going to erupt into discovery disputes, especially given what they've said in their pleadings in this, saying that, you know, at the time when the time's appropriate, they'll provide you information.

I think the case law is clear. If your claims survive, you're entitled to it unless, you know, there's something that I haven't considered or a case I haven't thought about. But I think the case law is pretty

established that you're entitled to it. I think it's just a question of the timing. I appreciate your concern about not wanting to move that trial. But as I look at this being a Judge Traum case, with her being up north and here, I just don't think the trial would be like a month or two after dispositive motions. I just don't think any trial goes that quickly.

Counsel, let me hear from you on this because I think Mr. Breeden does raise a point that concerns the Court, and that is I'll be here, you know, in eight months after the dispositive motions -- and if he's successful, I'm thinking -- I'm not predicting the future, but I think there may be, you know, some factual issues here. I don't want to be litigating this discovery issue in eight months while we have a trial date or a pretrial order, you know, pending.

MR. KALKOWSKI: Exactly, Your Honor. And so I have three points to that. The first is that financial information with punitives is always dependent on the status of that person at the time, you know, it's not looking into the past. So this is constantly fluctuating information. And there's -- it's no secret this district is incredibly busy with dispositive motions and how long that takes to sometimes be resolved, let alone schedule trial.

So we have this status of where we would need to provide answers at the time of actually providing those

answers, and also considering objections and potential privileges based on what the actual answer is in the moment. So that's the first reason to really hold off, and just it's fluctuating information. He's asking for information such as all personal property that has significant value; all debts or liability; businesses of which you're an owner in. So that's constantly fluctuating.

And then the second is just to preserve the Court's resources. I really -- when I -- when we went into argument earlier of we received and made an agreement on at least deferring, what I was essentially saying was that was their proposal in the interrogatories that we will allow you to defer, but on the condition you essentially never make any objection or privilege assertion. And I can't do that since, going back to that first point, the information is fluctuating.

And then the third is just to avoid delay. We have the dispositive motions that are coming up the third week of January, so it's not like we're looking, you know, years down the road where now we're going to have to have this flare up. I think the focus that Your Honor has said today often is you expect the parties to act in good faith. Of course, we always will. That is my focus.

The only objections that I currently want to point out to the Court, though, that we were making is this

overbreadth and non-proportionality aspect to what the punitive damages discovery was already going after. We cited case law talking about how three years is usually seen as overbroad, at least for punitives, because it's the status of the individual in the present, not looking back. But his requests go all the way to three years, and then five years for some of that information.

And then the fourth I guess defense to that motion would be the untimeliness of the motion. We've established that in the briefs or at least cited the case law on that point, but I just wanted to highlight that briefly for the record.

THE COURT: Well, I'm not going to toss it on untimeliness. Look, well, I do this at my own peril, but I -- again, I'm going to tell both counsel -- and, you know, tell your co-counsel and everybody else that may be appearing in this case -- I'm not sure what I'm doing with sanctions today, but we'll see how this goes the rest of this hearing, but I can tell you if these are the sort of things that if I come back and I'm, you know, hearing all sorts of privilege claims and all sorts of other claims that you're not going to turn any of this stuff over, you know, I'm going to seriously consider sanctions because, again, I'm going to deny the motion to compel and I'm going to grant the counter-motion for a protective order, but that's only because of the

timing.

And I want to be clear that I think that to the extent Mr. Breeden's claims survive the dispositive motions, and we don't know when that date's going to be -- I've got a couple of other motions I'm going to decide here in a minute that will affect that -- but when that time comes and they survive it, I'm going to look with extreme disfavor on any efforts to try to litigate, delay, you know, obstruct in providing this information.

Obviously, you have the right to make objections that you think you have a legal basis for, but I expect a little more collegiality and a little more cooperation in exchanging this information. You'll have plenty of time to fight about what went on in this holding cell at the time of the trial. Let's not fight over every little piece of discovery.

And so I'm saying if I'm back here in a number of months -- and, trust me, I've got a caseload that I don't remember cases -- this is one I'm remembering. I mean, if I'm back here in eight or ten months and I think there's some frivolous motions being filed, that is not going to be looked at with favor, and so keep that in mind.

While I'm denying his request now, it's not because I don't think it's justified, I think it's premature. And again, if he is successful and these claims are going to go

to a jury, then he's going to be entitled to that discovery, and I have every intent of making sure that discovery is exchanged quickly so that this matter can get onto the trial stack. And so with that, I will deny 43 and grant 49. Because I'm denying it, I will not impose sanctions today.

Now, the next one is actually a fairly interesting issue. Number 44 is the defendant's motion to compel plaintiff's expert ChatGPT log. In the motion, the defendants assert that while deposing plaintiff's expert witness, Tom Melton, Mr. Melton disclosed that he relied on ChatGPT when creating his expert report. Defendants seek to compel plaintiff to produce a copy of the ChatGPT log showing Melton's questions to ChatGPT and ChatGPT's outputs.

Defendants argue that this information is both something Melton should have disclosed as part of his report under Federal Rule of Civil Procedure 26(a)(2)(B)(1), subsections (ii) and (iii), and in response to their subpoena asking Melton to produce, quote, "all data, documents, and other information considered," end quote, in reaching his opinion.

Defendants also argue that ChatGPT information is vital to evaluating Melton's competence as an expert witness, especially because ChatGPT can, quote, "hallucinate," end quote. Defendants point out the plaintiff's argument that ChatGPT log is privileged or protected work product failed

because any privilege is waived by Melton disclosing the information to a third party, that is ChatGPT, and the log was not created by plaintiff's representative, Melton, but a third party, ChatGPT.

Plaintiff adds that the log does not constitute a, quote, "draft," end quote, report that is protected from disclosure under Federal Rule of Civil Procedure 26(b)(4)(B) because it consists of the factual material underlying Melton's report. Defendants seek their attorney's fees and costs incurred in bringing the motion to compel.

In response, the plaintiff argues that the ChatGPT log is protected by the work product doctrine because it consists of Melton's mental impressions and strategies when drafting his expert report. Plaintiff clarifies that the ChatGPT log consists of, one, case summaries of controlling case law on excessive force; number two, requests to ChatGPT to create a deposition outline; and, three, requests to ChatGPT to create portions of a draft report as to certain issues. Plaintiff asserts that if ChatGPT provided certain studies or articles, then those studies and articles would be discoverable and would appear in the report. Similarly, any hallucinations would also appear in the report such that defendants could challenge them.

Plaintiff adds that the ChatGPT log is protected under Federal Rule of Civil Procedure 26(b)(4)(B) as a draft

report. And, finally, plaintiff asserts that compelling disclosure would impose an undue public policy burden by creating a chilling effect on expert's use of modern research tools.

In reply, the defendants reiterate their arguments, also pointing out that Melton's report contains what appear to be fake case citations, fabricated quotes from case law, banned references to broad legal statements without any cited sources. Defendant asserts that the log is, therefore, important for impeachment purposes. And it adds that while attorney mental impressions are protected work product, Melton's mental impressions are not. Defendants reiterate their privilege arguments and arguments that the report is not a draft. Defendant asserts in closing, that allowing discovery of the ChatGPT log will not chill the use of modern technologies, but instead will promote fair litigation in the modern era.

As it relates to motions to compel, as I've indicated before, if a party resists discovery, Rule 37(a) authorizes the requesting party to file a motion to compel. The motion must include a threshold showing that the requested information is relevant and proportional. Again, that's *Tsatas v. Airborne Wireless Network Service*, a Nevada case from 2022, found at Westlaw 74003. And I would also cite the parties to the Federal Rule of Civil Procedure

26(b)(1).

Sanctions under Rule 37, if the Court grants a motion to compel, the Court must require the party whose conduct necessitated the motion, the party's attorney, or both, to pay the movant's fees, and that's Rule 37(a)(5)(A), but not if, one, the party moved before trying in good faith to obtain the discovery; two, the opposing party's nondisclosure was substantially justified; or, three, other circumstances make an award of expense unjust; and that's Rule 37. Substantial justification exists if reasonable people could differ on a matter in dispute.

Now, as it relates to expert reports, under Federal Rule of Civil Procedure 26(a)(2)(B), subsections (ii) and (iii), a witness report must contain, quote, "the facts or data considered by the witness in forming their opinions," end quote, and, quote, "any exhibits that will be used to summarize or support their opinions," end quote.

Under Federal Rule of Civil Procedure 26(b)(4)(B), an expert's draft of their report is protected as work product. Work product is, quote, "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative," end quote. And that's Rule 26(b)(3)(A). And if the Court orders disclosure of the materials, quote, "it must protect against disclosure of the mental impressions, conclusions, opinions,

or legal theories of a party's attorney or other representative concerning the litigation"; and that's Rule 26(b)(3)(B).

As it relates to attorney-client privilege, the attorney-client privilege protects confidential communications between attorneys and clients which are made for the purposes of giving legal advice. That's *United States v. Sanmina Corporation*, 968 F.3d 1107 at 1116, Ninth Circuit case from 2020. That same case stands for the proposition that the attorney-client privilege may extend to communications with third parties who have been engaged to assist the attorney in providing legal advice.

As I referenced at the top of making that record, this appears to be the new world that we're in, and it raises, at least from this Court's perspective, some interesting questions. I really don't need to hear any argument on this one, and I will just outline a couple of the Court's thoughts and why I'm going to rule the way I'm going to rule.

I believe that the ChatGPT log should have been disclosed under Rule 26(a)(2)(B)(ii) and (iii) because Melton considered it in forming and supporting his opinions. I think that that is pretty clear.

I don't think it's work product because it's not a draft of his report -- the ChatGPT, that is. While Melton

may have asked ChatGPT to draft certain portions of his report, the log itself is not the draft and, in any event, ChatGPT, not Melton, was the one to draft it.

The attorney-client privilege does not protect the ChatGPT log because it is not a communication between an attorney and Melton, but a communication between Melton and ChatGPT.

And so I believe that that is something that should have been turned over just like anything else that the expert would have relied upon in forming his opinion, and so I'm going to grant the motion to compel that plaintiff provide the expert's ChatGPT log.

The bigger issue I have, Mr. Kalkowski, is sanctions. And this is such a new area. I mean, this is something we've had, I don't know, what, a year or two? And I can see -- and this is my comment, not the Court as a whole, but I can see how that is going to affect our caseload. I see how it's going to, especially with pro se clients.

But because of that, I don't -- with the uncertainty of everything, I don't think Mr. Breeden was unreasonable for taking the position in an area of law that we really don't have much law on at all. And so why should this one -- in an area like this where it's so new and we're all sort of working through what this is and how it works and

what it does, and how it's going to be used, and how it's going to be affected, you know, in discovery and things, why should I impose sanctions given all of those uncertainties in such a new area of not just technology, but use of that technology in the law?

MR. KALKOWSKI: And I liked how Your Honor started that. This is incredibly interesting, right. We're at the forefront of this type of issue. The reason sanctions are appropriate, though, is because it always falls back to those baseline standards that have been set for decades. So Your Honor relied on FRCP 26 for the ruling today. That's been established. That's not new case law setting a new standard. That is establishing that this is a fact or data that the expert considered that should be discoverable. The fact that it exists in something that's a new technology doesn't change the baseline standard that compelled that information to begin with.

And I also want to direct the Court to the other cases that we've cited. For example, the *Republic of Ecuador v. Mackay*, this is a Ninth Circuit decision from 2014, and what that Court held was that communications the expert had with anyone other than the party's counsel about the opinions expressed are discoverable. So again, this reliance on FRCP 26 alone was the reason this had to be disclosed from the beginning without us even asking. And not only did that --

did we ask for that before the deposition, before the deposition was to go forward, there was no statements that this was AI generated in any way. We essentially found it out when I asked those questions at the very start.

So it just falls back to it is the baseline standard to that --

THE COURT: When you asked those questions, did the expert -- I mean, I know I'm asking you impressions, but did it seem to you that he even had considered this? I mean, did you know what -- is this the first time he had ever used ChatGPT in an expert report? Did you get into any of that?

MR. KALKOWSKI: His expert, in the questions I asked -- he is a very young expert, so he really hadn't prepared reports in cases before. His statement was that he had essentially put everything in the ChatGPT, and it gave him the responses that he used in his report. He didn't activate any confidentiality settings.

And I think Your Honor did an AI symposium recently that it may have gone over certain portions of how you can turn off confidentiality features of some of these. There was no action by that to try and ensure that the information stays within his control. And he also -- the biggest part of the portion during the deposition was that he essentially said that this would kind of be his work file; he conceded that during the deposition. We have that in the exhibit

itself where he did look at it as kind of like a secondary source, which he did provide to us under FRCP 26.

So from the expert's review -- expert's view, I don't think he had ever seen anything saying this couldn't be used, but I also don't see any reason why it would be withheld after the deposition, especially when Melton pointed out how this is like a secondary source that he has disclosed.

And then the third component of the sanctions purposes here is, really, the fact that there are what appear to be hallucinated case citations. You know, in our reply -- this is ECF number 63 -- on page 7 we have a chart listing what appear to be the fabricated cases and quotes. That's something that really is something that can be patrolled very easily with just looking at those and researching them. When I asked his expert whether he had reviewed the cases he was citing, he said "I always looked at them." Well, that's why we need the logs specifically, so now we can impeach that expert and show he's not actually checking these --

THE COURT: I'm giving you the logs.

MR. KALKOWSKI: Right.

THE COURT: I'm just trying figure out whether I'm going to impose sanctions.

MR. KALKOWSKI: Right. And that's how it goes to the sanctions purpose of there has to be some type of a --

some type of a barrier to doing this. And not only withholding that log -- that would be impeachable information before the deposition -- but then withholding it after, too, and not disclosing that. And again this falls under the fact that these are baseline standards on what an expert needs to disclose. It's not like it's a new case from the Supreme Court that came out interpreting FRCP 26 in a new way that had never been seen before with new technology.

THE COURT: So, Mr. Breeden, I guess that that is a point I hadn't considered, is, you know, was there any -- you look at this and think this is just like any other reference that he would use, whether it's some sort of, you know, like the old days, encyclopedias, books, information that he would rely on. Why -- even though this is a new technology, why isn't it something that he would say, yeah, I relied on that, just like these other things; I should disclose that. I mean, he is right, the rule is the rule. This is a new technology. But one would think he might do an analysis that says, all right, how does this play in.

MR. BREEDEN: I've never even seen a request from another attorney to an expert "produce your Google history. We just want to see what you were Googling when you were working on this." Or a medical expert, "hey, we want you to produce your PubMed search history"; that's a giant database of medical and journal articles.

I've never seen that because I don't think that is included in the materials that has to be turned over. That's the adversary's research, not necessarily things that were relied on in the report because that's set forth in the report. You're asking for the research of the other party.

And I do want to tell you, Judge, the chilling effect here is going to be very detrimental. And after this motion was filed, the expert asked me, "Adam, can I use ChatGPT moving forward in these?" And I said no. And that's just going to impair the expert being able to effectively research and draft their report.

THE COURT: What did they do before ChatGPT?

MR. BREEDEN: Pardon?

THE COURT: What did they do before ChatGPT? They did all that before ChatGPT.

MR. BREEDEN: Yeah, they used other sources of research, and I've never seen those ordered to be produced. A Google history? I've never seen that. This is, "hey, we want to know what U.S. Supreme Court cases you Googled and brought up on Lexis to prepare this." I've never seen a request for that. I think it's very unusual. This definitely is cutting edge. I was not able to find any other decisions that addressed this.

I'll give defense counsel points for creativity, but I just think this is run-of-the-mill work product.

There's a fine line here, but an important line, between research and then what the expert actually cites to and relies on for his report.

And, look, I'm sorry, maybe the Court doesn't want to hear this, but if an expert like a medical expert pulls up ten medical articles and only one supports their position, I think they're entitled to cite the one in their report and they don't have to disclose the other nine. That's just opposition research, and that's all I see this is.

THE COURT: Well, the issue I need to decide now is, having granted the motion to compel, is whether there's sanctions. And I'm -- you know, I'm not convinced that sanctions are just in this case with these circumstances. I think there is enough gray area here given this new technology. And I get that the rules are old, but I think number (iii) under Federal Rule of Civil Procedure 37(a)(5)(A) allows me to not award expenses or sanctions if I find other circumstances would make that unjust. And I think in this case, given what I've stated on the record about the new technology and how that plays into the discovery rules, I think an award of expense would be unjust, and so I'm going to deny the request for sanctions that is a part of number 44. Which leaves us with the motion to reopen discovery, number 46, and Metro's counter-motion to strike discovery, which is 55.

Yes, Mr. Breeden.

MR. BREEDEN: Your Honor, I apologize. And the Court did rule, but I would at least put on the record that I would ask the Court if maybe they could review this in camera to determine at least whether maybe the expert's prompts, but not the GPT responses, can be withheld, or why this would not be material that is simply draft passages of the report. I think it would benefit the Court to see the actual pages. But I'll sit down.

THE COURT: All right. Thank you.

In their motion at number 46, plaintiff moves, pursuant to Federal Rule of Civil Procedure 16(b)(4) and local Rule 26-3, to reopen expert and rebuttal expert disclosure deadlines which closed on August 4th, 2025 and September 3rd, 2025, respectively, and to reopen discovery which closed on October 10th, 2025; and that's at ECF number 26.

Plaintiff filed his motion to reopen discovery on October 20th, 2025, the same day the parties met and conferred. Plaintiff counsel explains that the extension is necessary because he did not receive radiology imaging from the hospital until late June, submitted the imaging to his previously retained expert, and learned in late July that his current expert needed a radiologist to read the reports. Therefore, it took plaintiff's counsel until October 9th,

2025, to retain a radiology expert and produce a report. Plaintiff explains that he decided to produce the report and then seek an extension.

Plaintiff counsel adds that plaintiff sought to see an ophthalmologist while in prison, and due to difficulties with the prison phone system, could not inform his counsel about his attempts and his ophthalmology visit until October 3rd, 2025. During that call, plaintiff informed his counsel that the ophthalmologist opined that plaintiff may require surgery.

Plaintiff's counsel argues that the plaintiff would face significant prejudice from not reopening discovery to allow the radiology images, the radiology expert, and discovery into the ophthalmology visit. On the other hand, the prejudice to defendants from reopening discovery would be minimal.

Plaintiff seeks a 90-day extension from the date of this motion; that the expert disclosure deadline he proposes, that is January 12th, 2026, is obviously fast approaching.

In response and in their counter-motion to strike, the defendants argue that plaintiff is simply attempting to avoid the consequences of his late disclosure and that the Court should instead strike his late disclosure of his radiology expert, Dr. -- I'm going to call him Dr. W, I'm not going to try to pronounce his name -- and the radiology

TRANSCRIBED FROM DIGITAL RECORDING

images.

Plaintiff asserts that Federal Rule of Civil Procedure 37(c) governs to prevent plaintiff's use of the records absent substantial justification or harmlessness, neither of which plaintiff show.

The defendants argue that they would be severely prejudiced by the expense and need to depose and retain additional experts, and that reopening discovery -- and that reopening discovery will cause. Additionally, defendants point out the plaintiff had the radiology imaging at issue since June of 2025, but did not disclose them until the last day of discovery. Moreover, Dr. W's late disclosed report was dated September 18th, 2025, about two weeks before the close of discovery.

Defendants add that plaintiff has not disclosed the request he made in prison to see an ophthalmologist, or any estimated calculation of damages related to ongoing treatment. Defendants argue that plaintiff's visit to the ophthalmologist and potential future medical care come as a surprise, and they seek their attorney's fees and costs in bringing the counter-motion to strike.

In reply and response to the counter-motion to strike, plaintiffs point out that Dr. W's report was dated by the expert on September 18th, 2025, but not provided to counsel until October 2nd, 2025, and then counsel produced it

TRANSCRIBED FROM DIGITAL RECORDING

seven days later. Plaintiff concedes that there is some dispute over whether he disclosed the radiology images, although he asserts that he did disclose the radiology reports, and that he will look into that potential issue. But he adds that the defendants have known from the outset that plaintiff suffered facial fractures, so the fact that there are images should not be a surprise.

Regarding Federal Rule of Civil Procedure 37(c), plaintiff argues that he can show substantial justification and harmlessness given the following: Number one, difficulty he and his counsel faced in communications given his client's incarceration. Number two, that his counsel substantially produced the radiology records, even if he did not produce the images. Number three, because his counsel provided defendants with a HIPAA release, they could have obtained the images themselves. Number four, his counsel experienced delays in receiving plaintiff's radiology records. Number five, his counsel was prompt in retaining the radiology expert once he learned it was necessary. Number six, the limited nature of the radiology expert report in making or in marking and explaining the significance of the fractures. And number seven, the fact that the case is young and trial is not yet set.

Plaintiff also offers to pay for the cost of the court reporter for Dr. W's deposition, and offers to

stipulate to allow defendants to produce a rebuttal witness to reduce the prejudice to the defendants.

In reply and support of their counter-motion to strike, the defendants reiterate their argument and highlight that they are substantially prejudiced by plaintiff's untimely disclosure that he will be seeking future medical care and damages, which would change their case strategy. Defendants add to the fact that they had a HIPAA authorization from plaintiff does not override the fact that plaintiff's counsel was required to disclose what was in his possession.

Defendants also point out that the plaintiff has claimed to have been making medical requests and receiving treatment since August of 2025, but still has not produced records associated with those requests and treatment.

Defendants assert that allowing Dr. W's report would also be prejudicial because plaintiff's prior medical expert, Dr. Harrington, refuted an expectation of future medical care, but Dr. W's report claims that future care or even surgery may be necessary. Allowing this report to come in would require defendants to spend tens of thousands of dollars in additional discovery.

Now, the legal standard, Federal Rule of Civil Procedure 37(c)(1), provides that if a party fails to provide information or a witness as required under Federal Rule of

Civil Procedure 26(a), that party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial unless the failure was substantially justified or is harmless. That rule also authorizes the Court to impose sanctions.

Instead of or in addition to the sanctions of excluding witnesses and information, the Court may, one, order payment of the reasonable expenses, including attorney's fees caused by the failure; two, inform the jury of the party's failure; or, three, impose other sanctions such as directing that certain matters be taken as established, prohibiting introduction of certain evidence, jury instructions, striking pleadings, staying proceedings, dismissal or default, and treating the failure as contempt of court.

Federal Rule of Civil Procedure 16(b)(4) provides that a schedule may be modified only for good cause and with the judge's consent. Local Rule 26-3 provides that a motion to extend brought after the subject deadline expired must be supported by excusable neglect.

So, Mr. Breeden, I want to hear from you because it's sort of twofold. Let's talk first about the radiology report and images. Why not just move to extend the deadlines before, and then get that extension and provide them, as opposed to letting them pass and then providing it?

TRANSCRIBED FROM DIGITAL RECORDING

MR. BREEDEN: I -- you know, Judge, I just did not understand until the expert actually explained them to me how fine these injuries are and the extent of them. These are very-difficult-to-read CTs. We've had Dr. Harrington and now another ophthalmology expert that we've retained tell us that. And unfortunately, one of the things that frames this case is, you know, the discovery deadlines are rather short here in the standard discovery plan. And in a typical case, I would have all of these documents and medical records together, and I would have them reviewed by experts before we even filed the complaint. But this is a case that the client filed in proper person, and I came in. And, you know, look, my client's incarcerated, but I believe he deserves to have the best case made for him that's possible.

All I did in this case, Judge, was, as we received new or additional evidence, I disclosed it within a short period of time of receiving it, and then I moved to extend the deadlines so that those -- that evidence could be used at trial. I would say that my expectation originally was that Dr. Harrington would be able to testify to the CT images, and he indicated that he needed more of a radiology specialist to assist to that.

THE COURT: So let's dovetail that into the ophthalmology. How does it -- so again, without getting into any findings of fact, but the allegations are that your

client basically has his face busted in. How do we not know that that is affecting the eyesight? I mean, flesh that out a little for me why that took so long to come up and, all of a sudden, now, after the close, we have one expert saying "I don't think there's going to be any future stuff," and then he goes to an eye doctor -- did he -- well, why don't you just tell me about how that sort of played out, or at least your understanding of it.

MR. BREEDEN: Yeah. And I'm going to give you a timeline of things that happened since we completed this briefing, too, because I've been diligently working on this to the extent that I can. But the problem is ophthalmology, obviously, a very fine field -- when we originally got this case, we just did not have any thorough evaluations of the client by an opthalmopathy specialist so that we could form our expert reports and opinions. He's in the Nevada Department of Corrections; they will not allow me to hire an ophthalmologist and have them sent there for an evaluation.

The client was trying to get an outside referral for an ophthalmologist because they do not have an in-house ophthalmologist at the Department of Corrections.

THE COURT: So is he --

MR. BREEDEN: He --

THE COURT: -- saying I'm having a problem with my eye, and it's related to the, you know --

MR. BREEDEN: Yeah, primarily double vision. And this turns out to be because the extraocular muscles which are actually -- they abut the eye, they're underneath the ocular bone, the eye socket where the fracture is -- you can see, now that we have the films, how badly displaced those are. So he's just going to have double vision unless it's surgically corrected.

THE COURT: So that's the surgery that they're talking about? That's what needs to be -- that's what the surgery will do or correct? That would be a big deal -- if I had double vision, I would want that, but is that what the surgery's for?

MR. BREEDEN: Yes. Yeah. He'll need a plate and to correct the positioning of the eye socket -- particularly on the lower part here, it's been significantly depressed. And you can actually see -- and again, I didn't see any of this until a radiologist pointed it out to me -- how displaced the extraocular muscles are. You can see how they are on the right side and the left side, and you see how much lower they are on the left side, so they're not working properly; hence, the double vision.

But you have to understand, too, the client has no control over how fast NDOC gets him in to have this stuff evaluated.

THE COURT: Where's he at, by the way? Where is

he --

MR. BREEDEN: He's at High Desert.

THE COURT: Okay. Go ahead.

MR. BREEDEN: And it could take months or years, or not at all, to see a specialist like that. And they don't tell them. For security reasons, they don't go and say "you're scheduled on such and such a date."

THE COURT: Right.

MR. BREEDEN: So he doesn't know until, like, he's put on a bus to go there because they don't, you know, want friends or relatives showing up there.

So but let me update you on what has happened on this ophthalmologist issue over the last several months. So October 3rd is when my client first saw the outside ophthalmologist. Unfortunately, he was not given, or did not recall, the gentleman's name.

On October 6, we ordered those records from the Nevada Department of Corrections and Summerlin Hospital at the same time.

It was not until November 5th that the Nevada Department of Corrections sent us a medical records invoice. They have processing time; in this case, a month. Then they insist that you prepay for the records, and you can only mail them a check; that can't be done electronically.

THE COURT: They don't have Venmo?

MR. BREEDEN: Not those folks.

So on November 7th, we received a certificate of no records from Summerlin Hospital. Now, I was hopeful that we would get records. But I know, because I'm in this business, typically the ophthalmologist will not work directly for the hospital, they work for an outside company, right. So it's not the hospital that has the records, it's the ophthalmologist. But the client was not told or did not have the name.

On November 25th, we finally received the Nevada Department of Corrections's medical records, but they did not include the ophthalmology evaluation, for whatever reason. I don't know. They just simply didn't.

On November 30th, in anticipation that we would resolve this issue one way or another and eventually figure out who this ophthalmologist is and what the opinions were, we hired our own ophthalmologist expert, a Dr. Lefkowitz, essentially telling him, "hey, this is the case, we should have some records soon for you."

On December 3rd, we sent a further email request to the Nevada Department of Corrections operations people saying "you have omitted these ophthalmology records. We need them to figure out where the client got treatment."

On December 5th, finally -- so this is two months after they were originally requested -- we did finally

receive those records that showed that the ophthalmology provider was a Dr. Hollifield at Retina Consultants of Nevada, and we produced those records. I think we received them on a Friday, and we produced them on Monday, the 8th, to the defense.

On December 14th, we received an updated report from Dr. Harrington, which we produced actually earlier today.

On December 15th, we had sent the new records we received to our expert, Dr. Lefkowitz. Dr. Lefkowitz and I have discussed the findings and the blurred vision, and he does indicate that this client -- that those vision problems are only going to be able to be fixed with a surgery involving a metal plate with a specialist, an oculoplastic surgeon -- there's very few of those in the state, or the west coast, but that's what he needs.

It was not actually until yesterday, December 22nd, we received the records directly from Retina Consultants of Nevada which we had requested on or about December 5th when we originally learned that Dr. Hollifield was involved.

THE COURT: When did your client first realize he was having double vision? Was that right after the incident, or is it something that took time? I mean --

MR. BREEDEN: He's been having this for some time. But the muscles, they just are not in the right place, so

they don't focus right.

There were some issues -- he also has diabetes, and there was some discussion; is this diabetes related or is this related to the assault? But the CT images just clearly show that those muscles are not in the proper place where they would need to focus the eye. So he's going to have double vision the rest of his life unless that is surgically corrected.

And so if you ask where this stands today, Your Honor -- and, you know, gosh, I wish I'd had all this information before I filed the case, right, and then I wouldn't need any additional time.

THE COURT: But so let me ask you this, though. So if I were to grant this, what is it you perceive doing? What discovery is remaining? We have the radiology expert deposition who is going to answer questions about the scan or the reports and the imaging, and then we would have the ophthalmologist records and the deposition of the ophthalmologist? Is that the extent of what you would need if we reopened this?

MR. BREEDEN: Yes, we would disclose the treating ophthalmologist and the retained expert ophthalmologist. We would probably also have a billing expert for the cost of the future surgery that was needed. And --

THE COURT: So any discovery is going to be related

specifically to this. So when --

MR. BREEDEN: Yes.

THE COURT: -- we list these things, it's going to be -- okay.

MR. BREEDEN: I do not need anything unrelated to the radiology and the ophthalmology expert's issue. And I would say, quite frankly, that once I have the written report of Dr. Lefkowitz to produce, which he said he hoped he would get it to me by last week, and he must have been distracted -- it was near the holidays -- but hopefully quite soon, then it's just up to the defense as to what they believe they would need.

I will note, however, that the defense has not even retained a medical expert in this case to dispute the nature of the injuries. Now, maybe they would if there were future surgeries planned. But they are objective injuries and fractures to the eye socket. They really can't deny the injuries. I think they have put all of their eggs in the liability basket in this case. So I don't know if they would even retain a defense expert. But certainly, I would agree that they would have the opportunity to retain rebuttal experts and depose the radiology and the ophthalmology report.

THE COURT: So, Mr. Kalkowski, you know as the caretaker of justice, so to speak, you know, I have a

philosophy that I want litigants to be able to develop their cases to be able to have a day in court and to not preclude that unless, you know, the law requires me, because I just think that when litigants have come to this stage of a case, that they ought to have an opportunity to develop it.

Now, again, I understand there's rules that limit that, and the like. But as I look at this and weigh this, every time I get a request to do this, there is going to be prejudice to the defense because you're going to have more attorney's fees, you're going to have more work. Some defense counsel like that because it's good for the bottom line for the firm. But it just -- it naturally happens.

And the other side of this is, you know, it's not completely unforeseeable that these might be issues given the nature of the incident and the injuries. And so I understand your prejudice, but I'm also trying to balance that with some of the difficulties Mr. Breeden is having just given the nature of where his client's at, the difficulties his client's had in getting, you know, communications to people, and then getting the return communications, and "am I going to get to the doctor? Am I going to do all this stuff?" And so I can certainly sympathize with that. And I'm afraid that I don't want that to be the reason why Mr. Breeden can't develop his case as he needs to develop it to get it where it needs to be to be tried. Why should I just cut them off on

that when it looks like these may be related to this injury or this incident?

MR. KALKOWSKI: There are two points to that. The first is the hard-and-fast rules that do really guide this. So I understand the Court's concern that this is a balance and you want to give someone their day in court, but you also have the hard-and-fast rules of disclosure obligations. And what Mr. Breeden just mentioned a second ago is critical. He mentioned how, really, it took an expert for him to see how fine the injuries are -- that's what he said -- and how difficult it was to read them.

Well, then, why weren't they given to my office until before the close of discovery on October 1st? Because counsel had them since the end of June. Those records -- the radiology slides themselves were the critical aspect, and we didn't have that until the end.

So that is a core element of this wasn't as if the plaintiff just is trying so hard to get these records and not getting them. He had the records and did not give them to us timely.

And the other aspect to this, too, is they've had an expert who was reviewing these radiology slides and providing these what are, as Your Honor recognized, changes in opinion since before the initial expert disclosure deadline even expired. And there wasn't a request to extend

the expert's disclosure deadlines, and we have that, or when the rebuttal deadlines came up or when the discovery cutoff deadline came up.

So in just a fairness and a weighing of the competing interests here, you really have the aspect of, well, the defendants have to have some interest, too, and a fair ability to create their defense timely after injuries. And there is one fact that I do want to add to the Court's consideration, which is that Mr. Villaneuva, during his deposition, testified to suffering what is, in my opinion, kind of a significant injury when he was working out that did affect his facial bones.

So this is an instance where you had what appear to be multiple overlapping symptoms. You have Mr. Villaneuva's injury from the actual incident, which I want to be very clear and push back on the fact that we do dispute causation with that. Now, whether there was any injury, certainly he was bleeding, so there are certain things that there can't be denied. But the extent of, that is being disputed.

But we also have diabetes, where the medical records show that doctors are attributing double vision or other things to diabetes treatment and his lack of taking the prescribed medications at times for diabetes.

And we have a third incident of he suffered this while working out where he slipped. I think he was on the

dead bar and he hit a handle and --

THE COURT: We're getting into -- I don't want to get into the case.

MR. KALKOWSKI: Right.

THE COURT: The question is why are you guys going to be prejudiced if I move these deadlines? Because then you're going to have more time to adjust your defense the way you need to adjust it.

MR. KALKOWSKI: I give all that background because the next point is the amount of prejudice, that how difficult it was for my office -- would be for my office to have to step in with an expert and try and distinguish all of this. Because not only do we not have an expert yet who would be able to just plug and play and to address these issues, I would have to go find an expert, a rebuttal expert; conduct depositions of this -- likely independent medical examiner would be appropriate for this type of situation where you have these different conflating reasons for the symptoms.

So overall on the weighing of the elements, there is severe prejudice on that front, but you also have the disclosure obligations that just were not met in this case. So I'm -- in the introduction section to our response, I really do mean it that this is a sense of trying to reopen discovery so that all these things that weren't disclosed can be put in.

And I think another important component of the obligation purpose here, none of his disclosures include any estimate of future damages or ongoing treatment. There is -- the case law in this district is clear that you have to provide an estimate or at least somewhat of a ball park range of ongoing or future medical care that you assume is going to be part of your request for damages. None of his disclosures have that during discovery. I can even point to the --

THE COURT: He's saying he just found out about the ophthalmologist, so he wouldn't have been able to disclose it.

MR. KALKOWSKI: He has had an expert on the radiology slides since August. I believe it was July and August he had the discussion. And he's also -- he's had two experts to provide at least an estimate of what the future medical care would be. We cited case law throughout our brief addressing how that is a requirement to pursue future medical damages. And importantly, with those two experts, that would be, at least from my view, something that the experts could ball park estimate and say a surgical intervention for this type of issue would cost X. So why was that not disclosed at all during discovery or added to it?

And importantly, this is not in the sense of we can just step in. Like I mentioned, we don't have -- we have not disclosed an expert. And due to these radiology slides, he's

testified how difficult it is to even find someone inside Vegas to address this to begin with, let alone now my office having to find one to provide an initial expert on -- expert report on this, a disclosure report on this, potentially an independent medical examination.

So this really is -- this is so much more than just "we want to disclose the experts and you can conduct depositions." It is far more than that.

THE COURT: Mr. Breeden, why not give the radiology information in July or August when you had it? Why wait until right before the close of discovery?

MR. BREEDEN: Well, to be honest with you, all of our disclosures have indicated that we intend to use the actual radiology films; that was with our initial disclosure. They, of course, had the reports all the time, and they have a HIPAA from my client as well.

It was not until this motion practice came up that they raised to me, "hey, you haven't sent us the actual films themselves, like, on CD or a flash drive." And I looked at it and said, well, all right, if you want us to send you the actual films if you don't have them already, we'll send them over to you. I did that.

I don't know what else to tell you about that issue. There is a case from this district that says, you know, look, most of the time, the defense prefers to have the

HIPAA and do this on their own and get their own records. So I was not aware they didn't have them.

THE COURT: I presume you intend to modify your damage calculation once you get these experts, if I allow you to do that?

MR. BREEDEN: Well, I think we're probably going to have to add cost of the future surgery. And again, I just discussed this on December 15th with Dr. Lefkowitz that he would opine more likely than not the client's going to have double vision unless he has this surgery. So that's when I found out.

I mean, the client was telling me in October that the other radiology -- I'm sorry, the other ophthalmologist was saying he may need surgery, but these are reports from my client. I didn't have the records.

THE COURT: All right. You know, as I look at this case and the age of it -- and I always tell litigants that federal court time is like time with your pets, dog years or cat years -- and so when I say that this case isn't overly old, I mean it in the sense of for federal cases in litigation. I think Mr. Breeden, in fact, has been on it less than a year.

And so, you know, when I factor that in with the totality of the circumstances, I do think that there is a substantial justification for their request. And I think

TRANSCRIBED FROM DIGITAL RECORDING

that the time that I am going to give as I grant their motion to reopen and deny the motion to strike, will minimize or at least alleviate on some level the prejudice and harm to the defense. And again I acknowledge there's always going to be that anytime I grant an order of or a request to reopen discovery. I'm going to grant that, and I'm going to order that your -- and I'm going to keep it on a tight -- on a tight schedule, and I'm not inclined to extend it.

And I am cautioning the parties about further discovery litigation because while no sanctions were ordered today, that may not be the case going forward if I continue to get litigation on this.

I'm going to order that your expert notices be provided by January 30th, 2026. I'm going to continue the rebuttal expert date to March 1st, 2026. And we will close discovery on March 31st, 2026. I'm going to order, to the extent that Dr. W -- and that's W-A-D-G-A-O-N-K-A-R -- Wadgaonkar, to the extent that deposition proceeds, I'm going to order the plaintiff to pay the costs of the court reporter and the transcripts for that deposition, given the fact that it was noticed late.

And I'm not going to consider entertaining continuing these dates unless there's some extremely extenuating circumstances. Given what you know now and the information you have now, the parties should be able to make

those dates and finish up these last few things so that the case can then proceed to dispositive motions.

And we probably should set a dispositive motion date, too. Dispositive motions would be due May 1st, 30 days after the close of discovery.

To the extent they aren't filed, your pretrial order will be due -- what do we usually make those, Angela?

THE COURTROOM DEPUTY: Thirty days.

THE COURT: Another 30 days?

THE COURTROOM DEPUTY: Yes, Your Honor.

THE COURT: So that would be June -- that would be June 1st for the pretrial order if dispositive motions are filed 30 days after the resolution of the dispositive motions. So that will be the case schedule.

And, again, I'm not going to be inclined to move those dates. And I'm not going to belabor the point anymore, but you've got a lot to fight over without fighting over each and every little thing. And maybe instead of having 80 requests for admissions, maybe we can pare them down. Maybe we can figure out a way to work together to exchange the information so that you can go fight about this stuff you really want to fight about.

But it's just -- it's just frustrating to the Court to see, you know, things that, you know -- each side, if you were a little more collegial and empathetic of what the other

side's going through, we wouldn't have to be sitting here doing this, we could be addressing issues related to the case. So I'm hoping I see more cooperation and collegiality in the next 30 to 45 days in this thing, so we can get discovery done and you can start filing dispositive motions and get on to litigating this.

Is there anything else from the plaintiff before we conclude the hearing?

MR. BREEDEN: Nothing from plaintiff, Your Honor.

THE COURT: Anything from the defense?

MR. KALKOWSKI: No, Your Honor.

THE COURT: All right. That will be the Court's order. As I indicated, the transcript and the minute order resolves all of these motions.

Court will be in recess. Thank you.

THE COURTROOM DEPUTY: All rise.

(Electronic recording stopped at 2:42 p.m.)

* * * * *

CERTIFICATE OF TRANSCRIPTIONIST

I, Gayle Wear, Federal Official Court Reporter in and for the United States District Court for the District of Nevada, do hereby certify that the foregoing is a transcription of the motions hearing proceedings electronically recorded in the above-entitled matter.

Dated 4th day of January 2026.

/s/ Gayle Wear
GAYLE WEAR, RPR, CRR